IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

———————————————————————— :

**N.N., by his parent, A.N.; T.G., by her parent,** :
**P.G.; A.H., by her parent, S.H.; T.W., by her** :
**parent H.M.; Y.R. by her parent, E.R.;** :
**on behalf of themselves and all persons similarly** :
**situated** :

      Plaintiffs, :  **CLASS ACTION**
             :  **COMPLAINT**
    vs. :
             :

**ROCHESTER CITY SCHOOL DISTRICT** :
**AND THE BOARD OF EDUCATION OF THE** :
**ROCHESTER CITY SCHOOL DISTRICT** :
             :  **Civil Action No.**
             :
    Defendants. :

———————————————————————— :

## <u>PRELIMINARY STATEMENT</u>

1. For far too long students with disabilities have been left behind in the Rochester City School District. These children are entitled to receive a free appropriate public education that will lead them to become independent, contributing members of their community and to lead full and productive lives.  However, because of widespread, decades-long, systemic violations, thousands of children have not received what they are entitled to by law.

2. To redress these violations, this class action is brought by five individual plaintiffs, all of whom are students with disabilities or parents of students with disabilities.  It challenges the systemic failure of the Rochester City School District ("RCSD") and the Board of Education of the Rochester City School District (the "Board", or collectively with RCSD referred to as the "District" or "Defendants") to provide a free appropriate public education ("FAPE") to students with disabilities and to provide their parents a meaningful opportunity to participate in the education of their children.

3.      Plaintiffs suffer because of the decades-long pattern of Defendants'
noncompliance with special education law, and this pattern is well-documented in reports
commissioned by Defendants over the last decade.

4.      Plaintiffs seek declaratory and injunctive relief requiring the District to cure the
systemic deficiencies in its special education system and provide the full range of programs,
placements, services, and due process protections to which students with disabilities and their
parents are entitled.

## JURISDICTION

5.      Plaintiffs bring this action to enforce their rights established by the Individuals
with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq*., its implementing federal
regulations, and its implementing state statute and regulations.

6.      This Court has federal question jurisdiction under the IDEA, 20 U.S.C. § 1400, *et
seq*., pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4) and supplemental jurisdiction over
Plaintiffs' state law claims under 28 U.S.C. § 1367 as such claims are part of the same case or
controversy, and arise from a common nucleus of operative facts.

## VENUE

7.      Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) because Defendants reside
in the United States District Court for the Western District of New York and all of the events or
omissions giving rise to this Complaint occurred or are expected to occur within the jurisdiction
of the United States District Court for the Western District of New York.

## CLASS ALLEGATIONS

8.      Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(b)(2)

on behalf of the following main classes and subclasses:

MAIN CLASS 1: All students with disabilities who were in the last two years, are now or

will be subject to the jurisdiction of the Rochester City School District Committee on

Special Education who were not, are not, or will not, be properly evaluated for special

education and related services as required by law.

> SUBCLASS 1.1: All such students who were, are now, or will be, potentially
> eligible for special education and related services, but were not, are not, or will
> not be, located, evaluated, and/or identified due to a systemic failure of RCSD to
> follow Child Find laws.

> SUBCLASS 1.2: All such students who did not, do not, or will not, receive initial
> eligibility determinations for special education and related services within 60 days
> of the Committee on Special Education receiving parental consent for evaluations
> because of systemic failures to determine their eligibility within the required
> timeframe.

> SUBCLASS 1.3: All such students who did not, or will not, have a Manifestation
> Determination Review following proposed suspensions, as required by law.

MAIN CLASS 2: All students with disabilities who were in the last two years, are now,

or will be, subject to the jurisdiction of the Rochester City School District Committee on

Special Education who did not, do not, or will not, receive legally required special

education and related services.

> SUBCLASS 2.1: All such students who were, are now, or will be, potentially
> eligible for special education and related services, but have not, do not, or will
> not, receive the special education programs and services listed on their
> Individualized Education Programs because of a systemic failure of RCSD to
> adequately plan for the known placement and programming needs of these
> students.

> SUBCLASS 2.2: All such, students who were, are now, or will be, denied their
> educational programs and services in the least restrictive environment because of

a systemic failure of RCSD to adequately plan for the needs of students classified with an "Emotional Disturbance."

SUBCLASS 2.3: All such students who were, are now, or will be, potentially eligible for individualized, outcome-oriented transition goals and services on their Individualized Education Programs, but have not, do not, or will not, receive individualized, outcome-oriented transition goals and services because of a systemic failure of RCSD to adequately plan for transition services and programming needs of these students.

MAIN CLASS 3: The parents of students with disabilities who were in the last two years, are now, or will be, subject to the jurisdiction of the Rochester City School District Committee on Special Education who have been denied a meaningful opportunity to participate in the education of their children as required by law.

SUBCLASS 3.1: All such parents whose right to meaningful participation in the education process has been denied because of RCSD's systemic failure to translate critical documents into the parent's native language.

SUBCLASS 3.2: All such parents whose right to parent training and counseling has been denied because of RCSD's systemic failure to provide this related service.

9.      Each main class and subclass meets the requirements of Rules 23(a)(1)-(4) and (b)(2) of the Federal Rules of Civil Procedure.

10.     Each main class and subclass is so numerous that joinder of all members of the subclass is impracticable.

11.     In 2018-19, the District identified approximately 6,500 students as students with disabilities entitled to educational programs and services under the IDEA.  Upon information and belief, each of the above classes including subclasses, contains more than 100 students or parents.

12.     There are numerous questions of law and fact common to each main class and subclass, respectively whether the Defendants' policies, procedures, and practices related to

timely identification, timely evaluation, timely eligibility for special education determinations, timely provision of education services, unnecessarily restrictive education, discipline of students with disabilities, and meaningful parental participation systemically violate federal and state laws and regulations.

13.     The claims of the named Plaintiffs are typical of the claims of the classes and subclasses that they represent in that each of the named Plaintiff students has a disability that would make the student eligible for special education and related services, or the named Plaintiff is a parent of a student with a qualifying disability, and they either (a) were never identified as eligible or potentially eligible for special education and related services; (b) experienced illegal delays in being identified as a student suspected of having a disability; (c) were illegally suspended or removed from school for disciplinary reasons without requisite due process protections; (d) did not receive the special education and related services listed on their Individualized Education Programs; (e) were not educated in the least restrictive environment; and/or (f) were not given meaningful access to their child's special education process because of inadequate translation and parent training and counseling.

14.     The named Plaintiffs will fairly and adequately represent and protect the interests of each main class and subclass that they represent.

15.     The named Plaintiffs have no interests that are antagonistic to the main class and subclass and seek relief that will benefit all members of the main class and subclass they represent.

16.     The named Plaintiffs are represented by counsel with significant experience with class action lawsuits and Education law.

17.     Defendants have acted, and continue to act, on grounds generally applicable to each main class and subclass, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to each main class and subclass as a whole.

**PARTIES**

**<u>Plaintiffs</u>**

18.     The five named Plaintiffs are: (a) students with disabilities within the jurisdiction of RCSD who were denied a free appropriate public education; and/or (b) parents of students with disabilities, who sue on behalf of their own children and/or assert their own individual rights to participate in the educational decision-making process for their children.

19.     In order to protect the confidentiality of the named representative Plaintiffs, the caption above recites the accurate initials of the named Plaintiff children and parents.  Plaintiffs submit a Motion to Proceed Pseudonymously in support of this request for confidentiality.  The true identities of the named Plaintiffs have been provided under separate cover to Defendants.

**<u>Defendants</u>**

20.     Defendant Rochester City School District ("RCSD"), a recipient of federal financial assistance, is a municipal corporation duly organized and existing under the laws of the State of New York and maintains a principal place of business in the County of Monroe, State of New York.

21.     Defendant Board of Education of the Rochester City School District ("the Board") is the duly elected Board of Education of the Rochester City School District.

22.     These Defendants are collectively referred to as "the District" in this action.

23.     The District is a local educational agency, within the meaning of the IDEA, whose mandate is to provide education to all school children residing within the Rochester City School District, including those with disabilities.

24.     There are approximately 29,984 students in public charter and RCSD public schools, of whom approximately 6,500, or about 22%, are currently classified as students with disabilities eligible for special education and related services under the IDEA.

25.     Defendants are obligated under IDEA to provide a free appropriate public education (FAPE) for all children with disabilities residing in the District.

## THE IDEA STATUTORY FRAMEWORK

26.     Congress passed the Individuals with Disabilities Education Act ("IDEA") to "ensure that all children with disabilities have available to them a 'free appropriate public education' that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living … [and] to ensure that the rights of children with disabilities and parents of such children are protected."  20 U.S.C. § 1400(d).

27.     To provide "free appropriate public education [FAPE]," school districts must ensure that their educational programs for students with disabilities are "appropriately ambitious," that schools focus on student progress, and that "every child [with a disability has]…the chance to me challenging objective."  Endrew F. Douglas Co. School Distr. RE-1, 137 S.Ct. 988, 1000 (2017).

28.     Students become eligible for a free appropriate public education under the IDEA if they fall into one of thirteen disability categories and if they also require "special education" and/or "related services."  34 C.F.R. § 300.8(a)(1).

## Child Find Framework

29.     Under the IDEA, the District must identify, locate, and evaluate all children with disabilities subject to its jurisdiction, including homeless children.  The District must also

determine whether children are currently receiving "needed" special education and related services.  *See* 20 U.S.C. § 1412(a)(3) and 20 U.S.C. § 1413(a)(1) ("Child Find"); *see also* RCSD Board Policy Manual Policy No. 4217.  The District is also responsible for Child Find for those students living within the District who are placed in private or religious schools by their parents. 20 U.S.C. § 1412(a)(10)(A)(ii)(I).

30.    After locating students with disabilities, school districts *must* initiate a referral to the Committee on Special Education ("CSE") for students who have not "made adequate progress after an appropriate period of time" when receiving general education.  8 N.Y.C.R.R. § 200.4(a) (emphasis added).

31.    The school the child attends or is eligible to attend is responsible for referring children ages 5-21 to the District CSE for individual evaluations and determination of eligibility for special education programs and services.  8 N.Y.C.R.R § 200.4(a).

32.    Referrals to the CSE for an individual evaluation may also come from parents, physicians, judicial officers, and certain public agencies.  20 U.S.C. § 1414(a)(1); N.Y.C.R.R. § 200.4(a).

33.    As alleged below, the District systemically fails to meet its Child Find obligations, leaving many students with disabilities without the special education programs and services they are entitled to receive under law.

**Initial Eligibility Framework**

34.     The referral to the CSE for an individual evaluation referenced in paragraphs 31-33 triggers the initial eligibility determination process.  20 U.S.C. § 1414(a)(1); N.Y.C.R.R. § 200.4(a).

35.     Upon receiving a written request for determination of initial eligibility, the "school district *must* initiate a referral and *promptly* request parental consent to evaluate the student."  8 N.Y.C.R.R. § 200.4(a) (emphasis added).

36.     School districts need informed parental consent before evaluating a student for the purposes of initial eligibility determination.  20 U.S.C. § 1414(a)(1)(D)(i)(I).

37.     Once a parent consents, the "initial individual evaluation shall include a variety of assessment tools and strategies" at no cost to parents, and must include at least:

> (i)     a physical examination…; (ii) an individual psychological evaluation, except when a school psychologist determines after assessment of a school-age student [and accordingly prepares a written report for the Committee on Special Education's review], that further evaluation is unnecessary; (iii) a social history; (iv) [a classroom observation]; and (v) other appropriate assessments or evaluations, including a functional behavioral assessment for a student whose behavior impedes his or her learning or the learning of others, as necessary to ascertain the physical, mental, behavioral and emotional factors which contribute to the suspected disabilities.

8 N.Y.C.R.R. § 200.4(b).

38.     The CSE, which includes the parent of the student with a disability, discusses the results of the evaluations and other related observations at a meeting and determines the student's initial eligibility for special education.  20 U.S.C. § 1414(d)(1)(B).

39.     With limited enumerated exceptions, school districts have sixty (60) school days after receiving parental consent to conduct the initial evaluation to assess and determine whether

a student is eligible under the IDEA for special education and related services.  20 U.S.C. §

1414(a)(1)(C); 8 N.Y.C.R.R. § 200.4(b)(1).

40.     These meetings are often called "Initial Eligibility Determination" meetings.

41.     As alleged below, the District systemically fails to render initial eligibility

determinations within 60 days of receiving parental consent for conducting special education

evaluations as required by law.

**Programs and Services Framework**

42.     Within the same sixty days of receiving parental consent for evaluations, the

District must also implement the programs and services for all eligible students with disabilities.

34 C.F.R. § 300.323; 8 N.Y.C.R.R. § 200.4(e)(1); RCSD Board Policy No. 4210; RCSD Board

Policy No. 4209.

43.     Furthermore, all eligible students with disabilities are entitled to have their

programs and services in effect at the beginning of each school year.  34 C.F.R. § 300.323; 8

N.Y.C.R.R. § 200.4(e)(1); RCSD Board Policy No. 4210; RCSD Board Policy No. 4209.

44.     "Programs and related services" include, but are not limited to, special education

classroom settings, supplementary aids and services, transition services, positive behavioral

supports and services, and parent training and counseling.  34 C.F.R. § 300.34.

45.      This broad spectrum of programs and services is referred to as the "continuum of

services."  The "continuum of services" is the entire set of options of special education services

the District must offer to students with disabilities.  34 C.F.R. §§ 300.115; 300.34; 8 N.Y.C.R.R.

§ 200.6.

46.    "Supplementary aids and services" include, but are not limited to, test accommodations, support staff such as "1:1 aides," behavioral support, assistive technology, and parent training.

47.    "Positive behavioral supports and service" must be evidence-based and made available to students whose behaviors impede their learning and that of their peers.  34 C.F.R. § 300.324(a)(2).

48.    Federal law requires that school districts provide "transition services" to students with disabilities, which are to be individualized, outcome-oriented services aimed at helping such students make the transition from secondary school to the real world (whether higher education or a job).  34 C.F.R. § 300.347(b).

49.    New York State requires that transition goals are included in individualized education programs (IEPs) by age 14 and that actual services begin by age 15.  8 N.Y.C.R.R. § 200.4(d)(2) (viii-ix).

50.    Accordingly, for students who have turned 14 or 15, a school district must notify parents that the CSE will meet to develop the requisite transition goals and services. 34 C.F.R. § 300.345(b)(2) and (3).

51.    As alleged below, the District systemically fails to timely provide the programs and services listed on the IEPs of eligible students with disabilities as required by law.

**Least Restrictive Environment Framework**

52.    Under the IDEA, school districts must provide a free appropriate public education to students with disabilities in the "Least Restrictive Environment" ("LRE"), which means that students with disabilities are afforded programs according to their individual needs, integrated among students without disabilities to the maximum extent possible, and placed "as close as

possible to the student's home."  8 N.Y.C.R.R. § 200.1(cc); *see also* 20 U.S.C. § 1412(a)(5), 34 C.F.R. §§ 300.114 and 300.116.

53.    Educational placements that are either outside of the Rochester City School District or provide instruction at home, rather than at school, are considered to be restrictive environments for purposes of LRE.

54.    As alleged below, the District systemically fails to educate students with disabilities in the least restrictive environment as required by law.

## Manifestation Determination Review Framework

55.    The CSE is responsible for developing positive behavioral strategies for students with disabilities whose behaviors impede their learning or the learning of others. 8 N.Y.C.R.R. § 200.4(d)(3)(i).

56.    Districts must hold a "Manifestation Determination Review" when the District proposes a suspension of 10 consecutive days or more for a student with a disability. 34 C.F.R. § 300.530(e); 8 N.Y.C.R.R. § 201.2(e)(1).

57.    Students are also entitled to Manifestation Determination Reviews when shorter suspensions add up to 10 days of suspensions within a school year, and the sanctioned conduct is part of a related pattern of suspensions; such disciplinary patterns are called "disciplinary changes in placement." 8 N.Y.C.R.R. § 201.2(e)(2).

58.    "Manifestation Determination Reviews" are conducted by a review team, which consists of a district representative, a CSE member and a parent. The team evaluates whether the problem behaviors were a manifestation of the student's disabilities and/or the District's failure to implement the student's IEP.  34 C.F.R. § 300.530(e); 8 N.Y.C.R.R. § 201.4(d).

59.    If the misbehavior was triggered by the student's disability and/or the District's failure to implement the student's IEP, the District must return the student to school immediately, subject to certain statutory exceptions.  34 C.F.R. § 300.530(c); 8 N.Y.C.R.R. § 201.7(d).

60.    The District must conduct certain program reviews and assessments where student misconduct is a manifestation of a student's disability. 34 C.F.R. §§ 300.530(e) and (f).

61.    The program reviews and assessments include functional behavioral assessments, behavioral intervention plans, and/or changes in educational placements or programming. 34 C.F.R. §§ 300.530(e) and (f).

62.    The purpose of these program reviews and assessments is to prevent students from repeating undesirable behaviors that impede their learning or the learning of others.

63.    Regardless of the manifestation determination, students with disabilities who are being disciplined are entitled to the necessary services enabling them to continue progressing towards the goals set out in their IEPs.  8 N.Y.C.R.R. § 201.10(d).

64.    As alleged below, the District systemically fails to record disciplinary changes in placement for students with disabilities who are struggling with behavioral issues, thereby denying these students their statutory procedural rights as well as the program and placement reviews as required by law.

**Translation of Critical Documents in Parents' Native Language Framework**

65.    When enacting the IDEA, Congress found that the federal government had to respond to the needs of an increasingly diverse country and that the English-language-learner (ELL) population was the fastest growing demographic.  20 U.S.C. § 1400(c).

66.    Furthermore, Congress found that students with disabilities' education is improved by "strengthening the role and responsibility of parents and ensuring that families of such children have meaningful opportunities to participate in the education of their children at school and at home…." 20 U.S.C. § 1400(c)(5)(B).

67.    When seeking informed consent for evaluations assessing special education eligibility, school districts must inform parents of all "relevant information to the activity for which consent is sought in [their] native language." 34 C.F.R. § 300.9(a).

68.    The District must provide notices that propose or refuse "to initiate or change the identification, evaluation, or educational placement of the child or the provision of a free appropriate public education to the child" in the native language of the parent.  20 U.S.C. § 1415(b)(4); 34 C.F.R. § 300.503(a) and (c). Examples of these notices include, but are not limited to: classifying or declassifying a student as eligible for special education; changing a student's classroom or school; and changing a student's level of supports and services.

69.    As alleged below, the District systemically fails to translate critical special education documents for parents into their native languages, as required by law.

**FACTUAL ALLEGATIONS OF THE INDIVIDUALLY NAMED PLAINTIFFS**

**N.N.**

70.    N.N. is a ten-year-old child who has resided with his mother, A.N., in the Rochester City School District at all times relevant in this action.

71.     N.N.'s claims are representative of RCSD students with disabilities who: (1) do not receive timely Manifestation Determination Reviews; and (2) do not timely receive the special education and related services listed on their IEPs.

72.     N.N.'s disabilities fall under the IDEA.

73.     In 2014, he was diagnosed with Attention Deficit Hyperactivity Disorder by the University of Rochester's Highland Family Medicine. In May 2016, he was diagnosed with Autism Spectrum Disorder by the University of Rochester Golisano Children's Hospital Developmental and Behavioral Pediatrics. In October 2016, while N.N. was in second grade, the District determined N.N. was eligible for special education and classified him under the "Autism" category.

**Failure to Hold a Manifestation Determination Review**

74.     Following N.N.'s classification, he had a good year due to his teacher's expertise in working with students with disabilities.

75.     However, in third grade, because N.N. had new teachers who did not engage well with him, his educational progress suffered.

76.     District records show that between September 14, 2017 and January 12, 2018, the District contacted A.N. at least 12 times regarding N.N.'s behaviors that ranged from acts of aggression to walking out of class without permission (elopement).

77.     The District's occupational therapist records also show that school security physically removed N.N. from his regular instructional setting in November 2017.

78.     In addition, between September and October 2017, A.N. reports that N.N.'s principal called her once or twice a week and requested that she pick-up N.N. from school due to N.N.'s disruptive behaviors, including flipping chairs over in class.

79.     The principal often instructed A.N. to keep N.N. home "for a couple of days" following his disruptive behaviors.

80.     This resulted in N.N. being removed from his usual classroom setting for disciplinary reasons in excess of 10 cumulative days.

81.     The District, however, unlawfully failed to record all of the instances the District removed N.N. from his classroom for disciplinary reasons (disciplinary changes in placement).

82.     In fact, District records are grossly inaccurate because they indicate that N.N. was only suspended for seven days during the fall of 2017.

83.     In addition, the District incorrectly marked N.N. "present" in school on most of the days the District directed A.N. to keep him at home.

84.     These removals constitute a related pattern of disruptive behavior and "disciplinary changes in placement," which triggered the District's legal obligation to hold a Manifestation Determination Review.

85.     The District, however, failed to schedule a Manifestation Determination Review, depriving N.N. of his statutory due process rights, as well as a programs and services review (including a Functional Behavioral Assessment), and therefore denied him a free appropriate public education.

**Failure to Provide Special Education Programs and Services**

86.     On two separate occasions, during the 2017-2018 school year, the District failed to timely provide N.N. the special education program and related services listed on his IEP.

87.     In the first instance, during the fall of 2017, the District failed to provide N.N. with any programs and services while he was serving a suspension.

88.     The failure to provide programs and services to students while they are suspended denies them a free appropriate public education.

89.     The District also failed to provide special education programs and related services to N.N. that were listed on his IEP following a CSE meeting on March 27, 2018.

90.     On March 27, 2018, the District CSE met and agreed that, beginning on April 9, 2018, N.N. would transfer to another Autism classroom in the District and begin receiving speech therapy.

91.     The special education programs and services decided upon at this CSE meeting were crucial for N.N. because starting in January 2018, A.N. kept N.N. home to monitor his safety after several reports from the District that N.N. was missing (elopement) and school security was searching for him.

92.     However, the District failed to provide N.N. any of the special education programs and services listed on his March 27, 2018 IEP for the rest of the school year.  By the end of June 2018, N.N. was still at home without a classroom placement.

93.     The District's failure to provide N.N. programs and services listed on his March 27, 2018 IEP is a clear denial of a free appropriate public education.

**Failure to Provide Parent Training and Counseling**

94.     The District was obligated to provide A.N. with parent training and counseling because of N.N.'s classification under "Autism."

95.     In October 2016, shortly after N.N.'s initial classification, the District contacted A.N. to inform her about the upcoming parent training and counseling session.

96.     Unfortunately, the only time the District offered A.N. to attend parent training and counseling directly conflicted with her rigid work schedule, as she advised the District.  The

District did not offer to reschedule training and programming and never again contacted A.N. to offer any future opportunities for parent training and counseling.

97.    Defendants' failure to provide parent training and counseling hindered A.N.'s ability to meaningfully participate in N.N.'s education.

98.    The problems that N.N. and A.N. experienced are examples of the systemic failures of the District to provide a free appropriate public education to student with disabilities and to provide parents of students with disabilities with a meaningful opportunity to participate in the education of their children, as more fully discussed below.

**T.G.**

99.    T.G. is a sixteen-year-old child who has resided with her mother, P.G., in the Rochester City School District at all times relevant in this action.

100.    T.G.'s claims are representative of RCSD students with disabilities who: (1) are not properly located, evaluated, and identified as required by Child Find; and/or (2) are placed in overly restrictive environments because the District fails to plan for the needs of students classified as having an "Emotional Disturbance."

101.    T.G.'s disability falls under the IDEA.

102.     In April 2017, T.G. was diagnosed with Major Depressive Disorder and Generalized Anxiety Disorder by University of Rochester Strong Behavioral Health.

**Child Find Violation**

103.    Defendants have known since 2009, when T.G. attended second grade at RCSD, or at least since August 8, 2017, that she was potentially a child with a qualifying disability who needed special education.

104.    In second grade, T.G. had severe issues with anxiety and the District repeatedly called P.G. to pick up T.G. from school because she was shaking uncontrollably.

105.    Due to T.G.'s severe anxiety, her parents decided to remove her from RCSD following second grade.

106.    From 2010-2015, T.G. attended Cobblestone School, a private school, and she thrived due to the small classroom ratio (approximately 12:1) and focus on the emotional well-being of students.  Unfortunately, in June 2015, Cobblestone closed.

107.    In September 2015, T.G. attended The Charles Finney School ("Charles Finney"), which is an out-of-district parochial school.

108.    In June 2017, Charles Finney expelled T.G. "due to failing all core subjects and because the school could not provide the support needed to ensure her success at the school."

109.    On August 8, 2017, with few options remaining, P.G. re-enrolled T.G. in RCSD and hand-delivered to the District a letter requesting T.G.'s evaluation by the CSE.

110.    At this same time, the District also collected from P.G. a medical release form where she checked "Special Education" as a reason for making a record request.

111.    Between August 8, 2017 and January 17, 2018, P.G. repeatedly asked the District to provide T.G. special education assistance and services.

112.    In fact, between August 2017 and September 2017, P.G. made several calls to the District imploring the District to put T.G. special education assistance and support in place before the beginning of the school year.

113.    The District was indifferent toward P.G.'s requests for special education classification and subsequent programs and services for T.G. despite its knowledge that T.G. was a student who potentially had a disability.

114.    Ignoring T.G.'s special education needs, and without starting the evaluation process or holding a CSE meeting, in mid-September 2017, the District placed T.G. on Home/Hospital Instruction (i.e., in-home tutoring), which is a general education placement that does not provide special education programs and services.

115.    On November 3, 2017, due to P.G.'s persistence, the District finally answered her pleas for assistance and agreed to evaluate T.G. for a qualifying disability and requested P.G.'s consent to evaluate T.G.

116.    On November 3, 2017, T.G.'s in-home tutor brought the consent form to P.G. and she signed and returned the form on that same day.  For unknown reasons, the District did not record the consent form as "received" until December 5, 2017.

117.    Under Child Find, the District has an affirmative duty to locate, identify, evaluate and provide services to children who may be disabled and may need special education and related services.

118.    If the District fails to do so, it has defaulted on its obligation to identify, locate and evaluate children with disabilities who need individualized special education programs.

119.    In this instance, RCSD employees knew or had reason to suspect that T.G. had a disability, at least as early as August 8, 2017, triggering the District's affirmative duty to act on T.G.'s behalf.

120.    The District's failure to act until November 3, 2017 was a violation of its Child Find obligations under the IDEA.

121.    On January 17, 2018, the District CSE found T.G. eligible for special education and related services, classified her under the IDEA category "Emotional Disturbance," and recommended that she receive a therapeutic small classroom setting.

122.    However, RCSD had no suitable internal programs for students with emotional disabilities who needed small therapeutic settings, and no out-of-district placement was readily available.

**Failure to Place in Least Restrictive Environment**

123.    Therefore, the District placed T.G. on "Home Instruction," the most restrictive environment, in which she received two hours of tutoring per day and psychological counseling, in violation of the IDEA mandate to educate students with disabilities in the *least* restrictive environment possible.

124.    On February 7, 2018, T.G. began receiving special education in her home. However, T.G.'s continued isolation from her peers made it difficult for her to make progress on her IEP's Social/Emotional/Behavioral goals; progress required for her to receive a free appropriate public education.

125.     District records from this time note, "T.G. would thrive in a small school environment where she can socialize with teachers and peers" and "T.G.  doesn't have much opportunity to build relationships with peers."

126.    Thereafter, the District sent application packets for T.G. to nearby out-of-district placements, including the e-START program with the Board of Cooperative Educational Services.

127.    On March 19, 2018, T.G. was accepted to the e-START program. On March 21, 2018, the District held a CSE program review meeting and officially placed T.G. at e-START beginning on April 9, 2018.

128.    Without any other viable placement options available, P.G. supported T.G.'s placement at e-START because it was less restrictive than Home Instruction.

129.    Although e-START was a more appropriate placement than Home Instruction, P.G. describes e-START as institutional in nature and T.G. continues to feel isolated from her peers in this placement.

130.    T.G. is presently not performing well academically or emotionally in this overly restrictive environment.

131.    Academically, she is barely passing all of her classes despite testing in the above average range intellectually.

132.    Emotionally, T.G. recently told her mother that she has never felt more depressed and that she believes this is a result of not having friends at school and no path to developing friendships at e-START.

133.    The District fails to provide suitable internal programs for academically capable children with emotional psychological or psychiatric disabilities who need small therapeutic settings.

134.    As a result, T.G. was placed on Home Instruction, followed by an out-of-district placement that is overly restrictive because no other options were available. Both of these

placements constitute a denial of a free appropriate public education in the least restrictive environment.

**Failure to Provide Programs and Services**

*A. Failure to Provide Transportation Listed on an IEP*

135.    To access the e-START placement, T.G.'s IEP provided for specialized transportation in a small vehicle "due to significant behavioral and management needs".

136.    However, the District informed P.G. that it would take an additional 30 days to arrange for this related service and that T.G. would remain on Home instruction in the interim, further denying T.G. a free appropriate public education.

137.    Faced with yet another hurdle to receiving appropriate special education and related services, but unwilling to delay T.G.'s education amongst peers until the very end of the school year, T.G.'s parents began transporting her to the out-of-district program and T.G. began attending e-START on April 9, 2018.

*B. Failure to Provide Adequate Transition Goals and Services*

138.    On March 21, 2018, when T.G. was sixteen years old, the CSE met for a program review.  However, the IEP transition goals and services established at that meeting were vague and not tailored to T.G.'s individualized needs, and were comprised largely of boilerplate sentences that could apply to any child, in violation of 8 N.Y.C.R.R. § 200. 4(2) (viii-ix).

139.    For example, in the 2018 IEP, the section describing transition services for "instruction" stated in its entirety: "The student will participate in courses to develop skills in the area of English, Mathematics, and Biology, and Computer Technology."

140.    Similarly, in the 2018 IEP, the section describing transition services for "community experience" stated in its entirety: "Considering the student's current level of performance, community experience is not needed at this time".

141.    The CSE met again in 2019 for a program review and, again, the IEP transition goals and services remained vague and not tailored to T.G.'s individualized needs.

142.    For example, in the 2019, IEP the section describing transition services for "instruction" states in its entirety: "T.G. should continue with coursework to earn a Regents Diploma and explore vocational and educational opportunities."

143.    Similarly, in the 2019 IEP, the section describing transition services for "community experience" states in its entirety: "T.G. should pursue opportunities in the community that allow her to explore her interests and possible career fields."

144.    As a result of inadequate transition goals and services, P.G. fears that T.G. will drop out of high school as soon as she is legally able to do so.

145.    RCSD has failed to provide T.G. with meaningful transition services in violation of 8 N.Y.C.R.R. § 200.4(2) (viii-ix).

146.    The problems that T.G. experienced are representative of the systemic failures of the District to provide a free appropriate public education to student with disabilities.

**T.W.**

147.    T.W. is a thirteen-year-old child who has resided with her mother, H.M., in the Rochester City School District at all times relevant in this action.

148.    T.W.'s claims are representative of RCSD students with disabilities who: (1) do not receive timely determinations of eligibility for special education and related services; and (2) do not receive the special education and related services listed on their IEPs.

149.    T.W.'s disability falls under the IDEA.

150.    She was diagnosed with Attention Deficit Hyperactivity Disorder on March 29, 2017 at the Anthony L. Jordan Health Center.

151.    Shortly after receiving this diagnosis, H.M. referred T.W. to the District CSE.

152.    On May 23, 2017, H.M. provided the District with consent to evaluate T.W. for eligibility for special education programs and related services.

153.    This parental consent triggered the District's 60-day legal obligation to complete its assessments, issue an initial eligibility determination for special education and implement special education programs and services listed on any resulting IEP.

**Initial Eligibility Violation**

154.    However, due to the delays described below, T.W. was not timely evaluated for special education services, was not found eligible for special education until October 13, 2017, and did not receive all of the special education programs and services listed on her IEP until January 2018, a four-month delay beyond what is legally required.

155.    On July 12, 2017, the District convened a CSE meeting to evaluate T.W.'s eligibility for special education, but the District adjourned the meeting because it had failed to complete all required assessments needed to adequately evaluate T.W.'s educational needs.

156.    On October 18, 2017, following an Independent Educational Evaluation ("IEE"), which found that T.W. "showed specific deficits in reading, spelling, math, and writing," as well as weakness in her "listening comprehension skills and abilities," the District found T.W. eligible for special education under the "Other Health Impaired" category.

157.    The District should have found T.W. eligible no later than August 15, 2017, which would have required the District to have programs and services in place on the first day of school.

158.    The District, however, failed to make an initial eligibility determination within 60 days of receiving parental consent, denying T.W. her right to a free appropriate public education.

**Failure to Implement Programs and Services**

159.    Under the IDEA, the District was required to implement T.W.'s programs and services within 60 days of receiving her mother's parental consent for evaluations, but failed to do so.

160.    Thereafter, pursuant to the October 17, 2018 IEP, the District agreed to provide Direct Consultant Teacher Services and the Resource Room Program for English and Math beginning on November 6, 2017.

161.    However, the District failed to provide the Direct Consultant Teacher services until January 2018.

162.    The District failed to provide T.W. educational programming listed on her IEP between early September, 2017 and January 2018, delaying well beyond the statutory 60-day timeline required for initial eligibility determinations and the initial provision of special education services, resulting in a denial of a free appropriate public education.

163.    The District again failed to provide T.W. programs and services during the 2018-19 school year.

164.    On September 5, 2018, T.W. enrolled in School of the Arts as a violin major, following a competitive audition process.

165.    T.W. had an IEP in place at the beginning of the school year that required Resource Room programing five days a week for 40 minutes each day.

166.    However, the District failed to provide this programming as listed on T.W.'s IEP because two and half days of the week the District only offered Resource Room at times that conflicted with T.W.'s orchestra class.

167.    On October 1, 2018, the District held a CSE meeting and forced T.W. and H.M. to choose between continuing the orchestra course or receiving the full amount of Resource Room programming.

168.    H.M. made the choice to continue orchestra because it was T.W.'s major and a motivating factor for T.W. to attend school.  T.W.'s IEP was changed to reduce the Resource Room programing to two and half days a week.

169.    However, deprived of the full amount of Resource Room time she truly required, T.W.'s grades declined.

170.    As of June 2019, without receiving adequate Resource Room services, T.W.'s Math grade dropped from a C to an F, her remedial Math course grade dropped from an A to an F, and her English grade dropped from a D to an F.

171.    The problems that T.W. experienced are representative of the systemic failures of the District to provide a free appropriate public education to students with disabilities.

### A.H.

172.    A.H. is a seven-year-old child who has resided with her mother, S.H., in the Rochester City School District at all times relevant in this action.

173.    A.H.'s claims are representative of RCSD students with disabilities who do not receive the special education and related services listed on their IEPs.

174.    A.H.'s disability falls under the IDEA.

175.    She is diagnosed with Trisomy 21, which is commonly referred to as "Down Syndrome."

176.    A.H. is classified under the "Intellectual Disability" eligibility category.  This category is marked by significantly-below-average general intellectual functioning with deficits in adaptive skills and onset early in a child's life.

177.    In April 2016, in anticipation of A.H. beginning kindergarten the following September, the District Committee on Preschool Special Education referred A.H. to the District Committee on Special Education, which addresses special education for school-age children.

178.    On July 5, 2016, the District found A.H. eligible for special education as a school-age child.  A.H.'s special education program included a Supplementary School Personnel ("1:1 aide"), who would help implement A.H.'s IEP by providing "support/supervision with safety awareness, all transitions, hygiene tasks, and in classes/activities" throughout each school day across all settings.

**Failure to Provide Programs and Services Listed on IEP**

179.    Under the IDEA, the District was required to provide the programs and services to A.H. on the first day of school of the 2016-17 school year and the 2017-18 school year.

180.    A.H. acknowledges that the violations described below that occurred during the 2016-17 school year are time-barred but provides these facts to demonstrate the systemic and ongoing violation that continued into the 2017-18 school year.

181.    As discussed below, it took Defendants until April 2018 to consistently provide a 1:1 aide to A.H. as required by her IEP.

182.    Generally, 1:1 aides help keep students with disabilities integrated in classrooms with their non-disabled peers.  This critical service enables the District to meet its statutory requirement to educate students with disabilities in the "least restrictive environment."

183.    During the 2016-17 school year, the District repeatedly contacted S.H. to inform her that there was no 1:1 aide available for A.H. and they suggested that S.H. could come to pick-up A.H. from school because no 1:1 aide was available.

184.    The District relies heavily on temporary employment agencies to provide staffing for 1:1 aides.  This results in transitory and unreliable coverage for children whose disabilities necessitate consistency, which deprives children of the programs and services identified in their IEPs.

185.    By the end of A.H.'s kindergarten year, her report card showed that she failed art, English language arts, mathematics, science, social studies, and physical education.

186.    In September 2017, A.H. started first grade and her IEP continued to include a 1:1 aide across all settings throughout the day.

187.    However, the District again failed to consistently provide a 1:1 aide as stated on A.H.'s IEP.

188.    During the Fall of 2017, S.H. received multiple communications from the District reporting that A.H. lashed out at other students and teachers when her 1:1 aide was not present.

189.    For example, A.H.'s consultant teacher contacted S.H. and informed her that A.H. frequently threw items in the classroom when the 1:1 aide was not present in the classroom.

190.    Moreover, in March 2018, A.H.'s Physical Education teacher also reported that A.H.'s 1:1 aide was not consistently present during gym class and that the aide's absence had resulted in A.H.'s physical displays of frustration.

191.    A.H.'s IEP progress report, dated April 2018, reported that A.H. demonstrated no progress on her annual goal regarding independent toileting skills.

192.    Moreover, A.H.'s 1:1 aide was responsible for updating S.H. on A.H.'s progress on this skill, but the 1:1 aide's April progress report was a verbatim copy of the January progress report.

193.    The failure of the District to provide A.H. with a 1:1 aide throughout the day across all settings, as provided on her IEP, denied A.H. a free appropriate public education.

194.    By mid-April 2018, after nearly two years of sporadic service delivery, the District finally provided A.H. with a consistent 1:1 aide as provided in her IEP.

195.    The problems that A.H. experienced are representative of the systemic failures of the District to provide a free appropriate public education to students with disabilities.

**E.R. & Y.R.**

196.    Y.R. is a seven-year old child born in Bayamon, Puerto Rico.  Y.R. has resided with her mother, E.R., in the Rochester City School District at all times relevant in this action.

197.    E.R. and Y.R. moved from Puerto Rico to Rochester in August 2015.

198.    Y.R.'s disability falls under the IDEA.

199.    On or about August 2015, Y.R. was diagnosed with Generalized Anxiety Disorder, Attention Deficit Hyperactivity Disorder, and unspecified developmental delays.

200.    Y.R. was also diagnosed with Autism Spectrum Disorder while living in Puerto Rico and had an IEP in Puerto Rico for early intervention services.

201.    As discussed below, Y.R.'s claims are representative of RCSD students with disabilities who: (1) are not properly located, evaluated, and identified as required by Child Find; and/or (2) do not receive the special education and related services listed on their IEPs.

202.    As further discussed below, E.R.'s claims are representative of RCSD parents of students with disabilities who do not receive documents in their native language as required by law.

**Child Find**

203.    Defendants have known since at least November 2015, when E.R. referred Y.R. to the District's Committee on Preschool Special Education ("CPSE") and provided written consent for the District to evaluate Y.R. to determine eligibility, that she was potentially a child with a qualifying disability who needed special education.

204.    Under Child Find, the District has an affirmative duty to locate, identify, evaluate and provide services to children who may be disabled and may need special education and related services.

205.    As explained below, the District knew or had reason to suspect that Y.R. had a disability, triggering the District's affirmative duty under Child Find to act on Y.R.'s behalf.

206.    From January 2016-June 2017, Y.R. attended Sunshine Village, a private preschool placement.

207.    On September 30, 2016, the District's CPSE classified Y.R. as a preschool student with a disability and found that she was eligible to receive special education itinerant teacher and speech therapy in the preschool setting.

208.    Y.R. was on track to finish preschool and move on to kindergarten by the end of the 2016-17 school year.  When a child has received special education classification and/or services in preschool, the CPSE Annual Review committee is required to meet before the child enters kindergarten to determine if the District will declassify the child at the CPSE level or refer the child to the CSE for school-age children to determine eligibility when entering kindergarten.

209.    The CPSE IEP for Y.R., dated September 30, 2016, indicates that the committee should have held an annual review by June 22, 2017 to make this determination.

210.    However, upon information and belief, the District failed to hold a CPSE annual review meeting at the end of the 2016-2017 pre-kindergarten school year to determine if it would declassify or refer Y.R. to the CSE school-age team to determine eligibility when she entered kindergarten.

211.    E.R. alleges that no annual review meeting took place.

212.     Moreover, the District's IEP Direct records are devoid of any documentation showing that the District held an annual review meeting, made a referral to the CSE school-age team or a declassification determination.

213.    In September 2017, Y.R. began kindergarten in the District with no special education supports in place, despite the District's knowledge that Y.R. had been classified for preschool special education services and was potentially a school-age child with a qualifying disability who needed special education.

214.    Y.R.'s first quarter grades show that she was failing nearly all subjects.  E.R. also recalls that teachers expressed concerns about Y.R.'s attention and task completion.

215.    On October 11, 2017, uncertain why Y.R. was not receiving special education services in kindergarten, E.R. referred Y.R. to the CSE.

216.    Although District records show that the District received this referral, it failed to ask E.R. to consent to special education evaluations for Y.R., in violation of its Child Find obligation.

217.    On November 16, 2017, E.R. made a second request to the District CSE to evaluate Y.R. because the District still had not taken any steps to fulfill its Child Find obligations.

218.    Finally, on November 22, 2017, five months after the CPSE should have met and over a month after E.R.'s October 11, 2017 referral, the District mailed E.R. an English-only prior written notice form requesting consent to evaluate Y.R.  As described below, E.R. acted promptly to obtain a translation and returned this form on November 27, 2017.  Yet the District still delayed for several months more in scheduling the CSE meeting and providing Y.R. with the programs and services to which she was entitled.

219.    Sadly, on December 13, 2017, while still waiting for the District to locate, identify, and evaluate Y.R., and provide special education programs and services, she was suspended for three days after an incident where she threw items in the classroom, kicked over a desk, and kicked another student in the throat, causing injury.  District records indicate that teachers noted that these types of behaviors were ongoing in the classroom.

220.    On March 1, 2018, the District finally held an initial eligibility determination meeting and found Y.R. eligible, classified under the IDEA category "Autism", and recommended that she receive special education programs and services.

221.    On May 25, 2018, the Autism Spectrum Disorder Team found that Y.R. scored in the "severe range" for several behaviors characteristic of Autism Spectrum Disorder, and needed "a program that has autism strategies embedded into the program."

**Failure to Provide Programs and Services**

222.    The District was required to implement the programs and services on Y.R.'s IEP within 60 days after receiving Y.R.'s November 27, 2017 consent for evaluations.

223.    However, Y.R. began receiving special education programs and services on April 16, 2018, well beyond the 60-day requirement.

224.    The failure to implement programs and services within 60 days of receiving parental consent for evaluations was a denial of Y.R.'s right to a free appropriate public education.

**Failure to Translate Critical Documents into Parent's Native Language**

225.    E.R.'s native language is Spanish.

226.    District records reflect that on October 11, 2017, E.R. notified the District that she would need all documents translated into Spanish.

227.    Throughout the special education determination process, E.R. was repeatedly denied her right to meaningful participation in the education process due to the District's systemic failure to translate critical documents into her native language.

228.    On November 22, 2017, the District mailed E.R. an English-only prior written notice form requesting consent to evaluate Y.R.

229.    When E.R. receives notices from the District in English only, she routinely visits a local community organization to find someone who can read English and translate the document into Spanish for her.

230.    This process can take up to a week and E.R. characterizes this process as difficult and time-consuming.

231.    In order to understand the November 22, 2017 consent form and fully participate in her child's education, E.R. sought translation assistance from a local community organization as described above.

232.    On November 27, 2017, after seeking translation assistance, E.R. signed and submitted to the District an English-language consent form to evaluate Y.R. for special education eligibility.

233.    District records also show that a Spanish language consent form was signed on December 1, 2017, suggesting that the District only provided the correct form after-the-fact.

234.    On May 8, 2018, the District again sent an English-only consent form to E.R. requesting consent for the District's Autism Spectrum Disorder Team to evaluate Y.R.

235.    Out of desperation, E.R. immediately signed the form, unsure what she was signing.

236.    In addition, on multiple occasions, E.R. received notices from the District in English with one sentence in Spanish, directing her to call the District and request Spanish translation.

237.    However, when E.R. called the telephone number provided on the notices, no one answered or returned her calls.

238.    The District's failure to translate legally required documents into E.R.'s native language hindered E.R.'s ability to meaningfully participate in Y.R.'s education.

239.    The problems that Y.R. and E.R. experienced are examples of the systemic failures of the District to provide a free appropriate public education to student with disabilities and to provide parents of students with disabilities with a meaningful opportunity to participate in the education of their children, as more fully discussed below.

## EXHAUSTION WOULD BE FUTILE

240.    While the IDEA requires an aggrieved party to exhaust administrative remedies before bringing a federal civil action to court, courts excuse such requirement when exhaustion

would be futile. Futility arises when the administrative remedies do not adequately redress the harms done. J.S. ex rel. N.S. v. Attica Central Schools, 386 F.3d 107 (2d Cir. 2004).

241.    Exhaustion of administrative remedies is not required when students and their parents allege systemic violations - such as Plaintiffs do here - as opposed to individualized inquiries into the appropriateness of a specific child's special education and related services as outlined in an IEP. J.G. by Mrs. G. v. Board of Educ. of Rochester City School District, 830 F.2d 444 (2d Cir. 1987).

242.    Plaintiffs allege that the District's actions and inactions are the result of unlawful policies, practices, and procedures that apply district-wide. Therefore, exhaustion of administrative remedies would be futile.

## ADDITIONAL FACTUAL ALLEGATIONS

243.    For over a decade, the District has known of its systemic, detrimental, and unlawful failures to provide a free appropriate public education to students with disabilities, as alleged above.

244.    These violations have been well-documented in multiple reports on special education that were commissioned by the District and are listed below:

- 2008 Great City Schools Report entitled "Improving Special Education in the Rochester City Schools" ("Great City Schools Report"). This report noted substantial special education violations and provided to the District 35 recommendations for improvement;

- Reports authored by Patrick Tydings in 2013 and 2014 on the CSE process ("Tydings Reports"); and

- Dr. Judy Elliott's Report in 2017 entitled, "Report of the Review of Special Education -Rochester City School District" (the "Elliott Report"). This report substantiated special education violations and provided the District with over 150 recommendations for improvement.

**Child Find**

245.    The systemic Child Find violations are well known in the District and addressed in the Great City Schools Report, Tydings Reports and Elliott Report.

246.    For example, the Great City Schools Report noted the need for a centralized special education process to track students who do not attend District schools but are still subject to the District's jurisdiction based on residency.

247.    In addition, the Elliott Report noted the District's inability to appropriately track the needs of students previously enrolled in charter schools and returning to the District.

248.    Despite these reports and their recommendations, the District has failed to bring its system into compliance with federal and state laws and their implementing regulations.

**Initial Eligibility**

249.    The systemic initial eligibility violations are well known in the District and discussed in the Great City Schools Report, the Tydings Reports, and the Elliott Report.

250.    For example, the Elliott Report noted that between 2013-14 and 2015–16 the rate for noncompliance in the timeliness of initial eligibility determination doubled from 18% to 36%.

251.    Despite these reports and their recommendations, the District has failed to bring its system into compliance with federal and state laws and their implementing regulations.

**Manifestation Determination Review**

252.    The District's systemic non-compliance with the Manifestation Determination Review process is well known in the District and addressed in the Great City Schools Report, Tydings Report, and Elliott Report.

253.    For instance, over 10 years ago, the Great City Schools Report found that the District lacked clear written MDR policies, which led to an inconsistent understanding and noncompliant implementation of the MDR process.

254.    Further, the Elliott Report notes that the District failed to look at patterns of behavior that may relate to student misconduct.

255.    Despite these reports and their recommendations, the District has failed to bring its system into compliance with federal and state laws and their implementing regulations.

**Programs & Services**

256.    The systemic failure to provide special education programs and services listed on students' IEPs is well known in the District and discussed in the Great City Schools Report, Tydings Reports, and Elliott Report.

257.    For example, the Elliott Report noted that the District lacks organizational structures to consistently deliver, monitor, and support special education needs of students.

258.    Dr. Elliott further documented that 27%, or 1,504, of special education students did not receive the related services identified on their IEP within the first month of school, when the law requires that the District implement these programs and services on the first day of school.

259.    Despite these reports and their recommendations, the District has failed to bring its system into compliance with federal and state laws and their implementing regulations.

**Least Restrictive Environment**

260.    The District's systemic failure to educate students with emotional disabilities in the least restrictive environment is well known by the District and addressed in the Great City Schools Report, Tydings Reports and Elliott Report.

261.    To illustrate, over ten years ago, the Great City Schools report noted that the District heavily relied on overly restrictive out-of-District placements and stated that the District needed a comprehensive plan to expand its ability to meet the needs of students with disabilities.

262.    Five years later, the Tydings Reports noted that the District failed to make substantial changes in this practice and noted that ending this regrettable practice is the reason for the "least restrictive environment mandate" of the IDEA.

263.    The Elliott Report further noted the District's continued failure to create a continuum of services and placements based of the needs of its students resulted in an over reliance on outside agency placement.

264.    Despite these reports and their recommendations, the District has failed to bring its system into compliance with federal and state laws and their implementing regulations.

**Translation of Critical Documents**

265.    The District's systemic failure to provide documents critical to understanding the special education process to parents of children with disabilities in the parents' preferred language is well known by the District and addressed in the Great City Schools Report, Tydings Reports, and Elliott Report.

266.    For example, the Elliott Report noted parents who speak languages other than English are not fully informed in their native languages about their procedural rights and their children's IEPs.

267.    Despite these reports and their recommendations, the District has failed to bring its system into compliance with federal and state laws and their implementing regulations.

**The Special Advisory Committee Process**

268.    In 2018, after years of negotiations, Plaintiffs' counsel and the District agreed that the fastest and most effective way to resolve these systemic issues was through a collaborative process whereby the District would negotiate an agreement to correct all of its legal violations in a judicially enforceable document and Plaintiffs would forebear from filing litigation until after the parties had an opportunity to reach such a comprehensive agreement.

269.    As a result of this agreement, in 2018, the Rochester City School Board commissioned a Special Advisory Committee on Special Education ("Special Advisory Committee") to advise the Board on the scope of issues in providing students with disabilities a free appropriate public education in the District. The Committee was made up of representatives from the District, Empire Justice, community advocates and experts in special education.

270.    In May 2018, the Special Advisory Committee issued its first report, in which it identified 32 systemic violations that had been previously identified in the reports set forth above and as alleged in this complaint, that were still prevalent years later, in 2018.

271.    Shortly thereafter, in November 2018, the New York State Education Department Distinguished Educator for RCSD released a report that echoed the findings in all of the reports discussed above.

272.    In March 2019, the Special Advisory Committee issued a second report and recommendations which was submitted to the Board.  That report contained over 100 recommendations to cure the special education violations identified in the Special Advisory

Committee's first report.  It also contained recommended final disengagement goals and annual benchmarks to measure progress toward reaching those final goals.

273.    The parties completed their extensive negotiations reached a comprehensive proposed settlement and are filing this action to implement their agreement.

## CLAIMS

## FIRST CLAIM-CHILD FIND

274.    Plaintiffs repeat and reallege the allegations of all the above paragraphs as if fully set forth herein.

275.    The IDEA requires states and school districts to have policies and procedures that ensure that every student with a disability, regardless of the seriousness of the condition, be identified, evaluated, and that "a practical method is developed and implemented to determine which children with disabilities are currently receiving needed special education and related services."

276.    As set forth above, the District has policies, patterns, practices, and procedures that lead to a failure to identify, evaluate, and provide special education and related services to students with disabilities.  These failures are numerous, well-known, documented, and systemic.

277.    Defendants' actions and inactions violate the IDEA, 20 U.S.C. §§ 1400 et seq. and its implementing federal and state statutes and regulations, namely: 20 U.S.C. § 1412(a)(3); 20 U.S.C. § 1412(a)(10)(A)(ii); 34 C.F.R. § 300.304(b); 34 C.F.R. § 300.304(c)(4); 34 C.F.R. § 300.304(c)(6); 34 C.F.R. § 300.304(c)(7); N.Y. Educ. Law § 4402(1)(a); and 8 N.Y.C.R.R. § 200.4(a).

**SECOND CLAIM-TIMELY INITIAL ELIGIBILITY DETERMINATIONS**

278.    Plaintiffs repeat and reallege the allegations of all the above paragraphs as if fully set forth herein.

279.    The IDEA requires states and school districts to have policies and procedures that ensure students referred to the Committee on Special Education receive initial eligibility determinations for special education and related services within 60 days of the Committee on Special Education receiving parental consent for evaluations.

280.    As set forth above, the District has policies, patterns, practices, and procedures that all lead to numerous failures to provide timely initial eligibility determinations for students referred to the Committee on Special Education.  These failures are numerous, well-known, documented, and systemic.

281.    Defendants' actions and inactions violate the IDEA, 20 U.S.C. §§ 1400 et seq. and its implementing federal and state statutes and regulations, namely: 20 U.S.C. § 1414(a)(1)(C); 34 C.F.R. § 300.301(c); N.Y. Educ. Law § 4401-a(1); and 8 N.Y.C.R.R. § 200.4(b)(1).

**THIRD CLAIM-MANIFESTATION DETERMINATION REVIEWS**

282.    Plaintiffs repeat and reallege the allegations of all the above paragraphs as if fully set forth herein.

283.    The IDEA requires states and school districts to have policies and procedures that ensure students with disabilities have Manifestation Determination Reviews following proposed suspensions to determine whether student behavior was directly related to their disabilities or whether the students' programs and services should be adjusted.

284.    As set forth in above, the District has policies, patterns, practices, and procedures that all lead to a failure to timely conduct Manifestation Determination Reviews when required by law for students with disabilities.  These failures are numerous, well-known, documented, and systemic.

285.    Defendants' actions and inactions violate the IDEA, 20 U.S.C. §§ 1400 et seq. and its implementing federal and state statutes and regulations, namely: 20 U.S.C. § 1415(k); 34 C.F.R. § 300.530(e); 34 C.F.R. § 300.530(f); 34 C.F.R. § 300.534; and 8 N.Y.C.R.R. § 201.2(e)(2); 8 N.Y.C.R.R. § 201.7(d).

## FOURTH CLAIM-PROGRAMS AND SERVICES

286.    Plaintiffs repeat and reallege the allegations of all the above paragraphs as if fully set forth herein.

287.    The IDEA requires states and districts to have policies and procedures that ensure students with disabilities receive the special education programs and services listed on their Individualized Education Programs.

288.    As set forth above, the District has policies, patterns, practices, and procedures that all lead to a failure to provide students with disabilities with the programs and services listed on their Individual Education Programs.  These failures are numerous, well-known, documented, and systemic.

289.    Defendants' actions and inactions violate the IDEA, 20 U.S.C. §§ 1400 et seq. and its implementing federal and state statutes and regulations, namely: 20 U.S.C. § 1401(9); 20 U.S.C. § 1412(a)(3); 20 U.S.C. § 1414(d)(1)(A); 20 U.S.C. § 1415(k)(1)(D); 34 C.F.R. § 300.320(4); 34 C.F.R. § 300.323; 34 C.F.R. § 300.347(b), 34 C.F.R. § 300.551; N.Y. Educ. Law § 4401-a(5); 8 N.Y.C.R.R. § 200.4(d)(2)(v), (viii-ix); and 8 N.Y.C.R.R. § 200.4(e).

## FIFTH CLAIM-LEAST RESTRICTIVE ENVIRONMENT

290.    Plaintiffs repeat and reallege the allegations of all the above paragraphs as if fully set forth herein.

291.    The IDEA requires states and districts to have policies and procedures that ensure students with disabilities receive their programs and services in the least restrictive environment.

292.    As set forth above, the District has policies, patterns, practices, and procedures that all lead to a failure to provide students with "Emotional Disturbance" disabilities with programs and services in the least restrictive environment.  These failures are numerous, well-known, documented, and systemic.

293.    Defendants' actions and inactions violate the IDEA, 20 U.S.C. §§ 1400 et seq. and its implementing federal and state statutes and regulations, namely: 20 U.S.C. § 1412(a)(5); 20 U.S.C. § 1413(e)(4)(B); 8 N.Y.C.C.R. § 200.4(d)(4)(ii); and 8 N.Y.C.R.R. § 200.6(a)(1).

## SIXTH CLAIM-TRANSLATE CRITICAL DOCUMENTS

294.    Plaintiffs repeat and reallege the allegations of all the above paragraphs as if fully set forth herein.

295.    The IDEA requires states and school districts to have policies and procedures that ensure parents of students with disabilities have meaningful opportunities to participate in the education of their children by receiving critical documents concerning their children in their native languages.

296.    As set forth above, the District has policies, patterns, practices, and procedures that all lead to a failure to provide parents of students with disabilities critical documents in their native languages.  These failures are numerous, well-known, documented, and systemic.

297.    Defendants' actions and inactions violate the IDEA, 20 U.S.C. §§ 1400 et seq. and its implementing federal and state statutes and regulations, namely: 20 U.S.C. § 1415(b)(3); 20 U.S.C. § 1415(b)(4); 34 C.F.R. § 300.9(a); 34 C.F.R. § 300.9(b); 34 C.F.R. § 300.503(a); 34 C.F.R. § 300.503(c); N.Y. Educ. Law § 4402(3)(b)(ii)(B); and 8 N.Y.C.R.R. § 200.4(b)(6)(xii).

<strong>RELIEF</strong>

Plaintiffs, on behalf of themselves and all other persons similarly situated, request that this Court grant the following relief:

**FIRST**, certify this action as a class action, pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, for the classes and subclasses set forth above;

**SECOND**, enter a declaratory judgment that Defendants have violated the following federal and state laws and regulations:

The IDEA, 20 U.S.C. §§ 1400 *et seq*. and its implementing regulations, namely:

a.    The Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 *et seq*. and its implementing regulations, namely: 20 U.S.C. § 1412(a)(3); 20 U.S.C. § 1412(a)(5); 20 U.S.C. § 1412(a)(10)(A)(ii); 20 U.S.C. § 1413(e)(4)(B); 20 U.S.C. § 1414(a)(1)(C); 20 U.S.C. § 1414(d)(1)(A); 20 U.S.C. § 1415(b)(3); 20 U.S.C. § 1415(b)(4); 20 U.S.C. § 1415(k); 20 U.S.C. § 1415(k)(1)(D); 34 C.F.R. § 300.9(a); 34 C.F.R. § 300.9(b); 34 C.F.R. § 300.301(c); 34 C.F.R. § 300.304(b); 34 C.F.R. § 300.304(c)(4); 34 C.F.R. § 300.304(c)(6); 34 C.F.R. § 300.304(c)(7); 34 C.F.R. § 300.320(4); 34 C.F.R. § 300.322(e); 34 C.F.R. § 300.323; 34 C.F.R. § 300.503(a); 34 C.F.R. § 300.503(c); 34 C.F.R. § 300.530(e); 34 C.F.R. § 300.530(f); 34 C.F.R. § 300.534; 34 C.F.R. § 300.503(a); 34 C.F.R. § 300.503(c); 34 C.F.R. § 300.551; and

b.    New York State Education Law N.Y. Educ. § 1 *et seq*. and its implementing regulations, namely: N.Y. Educ. Law § 4401-a(1); N.Y. Educ. Law § 4401-a(5); N.Y. Educ. Law

§ 4402(1)(a); N.Y. Educ. Law § 4402(3)(b)(ii)(B); 8 N.Y.C.R.R. § 200.2(b); 8 N.Y.C.R.R. § 200.2(c); 8 N.Y.C.R.R. § 200.4(a); 8 N.Y.C.R.R. § 200.4(b)(1); 8 N.Y.C.R.R. § 200.4(b)(6)(xii); 8 N.Y.C.R.R. § 200.4(d); 8 N.Y.C.R.R. § 200.4(d)(2)(iii)(c); 8 N.Y.C.R.R. § 200.4(d)(2)(v); 8 N.Y.C.C.R. § 200.4(d)(4)(ii); 8 N.Y.C.R.R. § 200.4(e); 8 N.Y.C.R.R. § 200.5; 8 N.Y.C.R.R. § 200.6; 8 N.Y.C.R.R. § 201.2(e)(2); 8 N.Y.C.R.R. § 2;01.7(d);

**THIRD**, enter an order preliminarily and permanently requiring Defendants to take appropriate affirmative actions to correct the violations of federal and New York State statutes and regulations complained of above by a date certain to be determined by the Court;

**FOURTH,** an order granting Plaintiffs' counsel their reasonable attorney's fees pursuant to the IDEA, 20 U.S.C. § 1415(i)(3)(B-G); and

**FIFTH** grant such other relief as the Court deems just and proper.

Dated:    July 16, 2019
         Rochester, New York

**EMPIRE JUSTICE CENTER**

/s/ Maggie R. Robb
Maggie R. Robb
1 West Main Street, Suite 200
Rochester, New York 14614
Tel.: (585) 295-5724
mrobb@empirejustice.org


**NIXON PEABODY LLP**

/s/ Carolyn G. Nussbaum
Carolyn G. Nussbaum
1300 Clinton Square
Rochester, New York 14604
Tel.: (585) 263-1558
cnussbaum@nixonpeabody.com

*Counsel for Plaintiffs*